STEPHEN J. COFFEY, ET AL, [1] Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Coffey v. Commissioner
Docket Nos. 12304-87, 20174-87, 8786-88, 8881-88, 14111-89, 18341-89
United States Tax Court
T.C. Memo 1991-516; 1991 Tax Ct. Memo LEXIS 566; 62 T.C.M. (CCH) 1014; T.C.M. (RIA) 91516; October 15, 1991, Filed *566 Decision will be entered for the respondent. Richard Allen Block, for the petitioners. Shirley Francis, for the respondent. NAMEROFF, Special Trial Judge. NAMEROFF
MEMORANDUM FINDINGS OF FACT AND OPINION These consolidated cases were heard pursuant to the provisions of section 7443A(b)(3) of the Code [2] and Rule 180 et seq. These cases are test cases selected by the parties involving deductions and credits claimed by petitioners in connection with leases and purchases of master "sing-along" tapes (hereinafter sometimes referred to as "Songtrax"). Respondent made the following determinations [3] with respect to the petitioners involved in the six test cases: Dkt. No.
Petitioners
Year
Deficiency
12304-87
Stephen J. Coffey
1980
$ 485.00
1983
7,176.00
20174-87
Ronald D. & Evelyn
1980
1,043.00
Woods Jackson
1983
4,626.00
8786-88
Raymon E. Houghton
1984
2,335.00
8881-88
Mike S. &
Jacquelin Tamashiro
1980
1,512.00
1983
3,884.00
1984
2,747.00
18341-89
Mike S. &
1985
2,316.00
Jacquelin Tamashiro
14111-89
Linda Y. Dicken
1985
1,686.00
*567 Additions to Tax
Sections
Dkt. No.
6653(a)(1)
6653(a)(2)
6659
12304-87
[4] $ 24.25
-
-
358.80
*
$ 2,152.80
20174-87
52.15
-
$ 312.90
231.30
*
1,387.80
8786-88
116.75
*
604.20
8881-88
76.00
*
454.00
194.00
*
1,165.00
137.00
*
824.00
18341-89
115.80
*
694.80
14111-89
84.30
*
505.80
Respondent also determined that the deficiencies for each petitioner, except for petitioner Stephen J. Coffey for the taxable year 1980, constituted substantial underpayments attributable to tax-motivated transactions and that, therefore, petitioners were liable for increased interest under section 6621(c). The issues for decision are: (1) Whether any portion of losses claimed *568 by petitioners from their investments in Songtrax partnerships is allowable; (2) whether any portion of investment tax credits (ITC) claimed by petitioners from their investments in Songtrax partnerships is allowable; (3) whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules or regulations; (4) whether petitioners are liable for the additions to tax for valuation overstatements under section 6659; and (5) whether there are substantial underpayments attributable to tax-motivated transactions for purposes of computing interest under section 6621(c). FINDINGS OF FACT The stipulation of facts and attached exhibits are incorporated herein by this reference. All of the petitioners herein were residents of California at the time their respective petitions were filed. Stephen J. Coffey (Coffey) has been an electrician and a stage technician, as well as a producer of a sports boxing show. Ronald Jackson is a fire department captain, and Evelyn Jackson is a teacher. (They are referred to hereinafter collectively as Jackson.) Raymon E. Houghton (Houghton), currently is a salesman for a moving company. He has also been employed as *569 a subcontract administrator and in real estate sales. Mike S. Tamashiro is a cook and restaurant manager, while Jacquelin Tamashiro is a clerk in a drugstore. (They are referred to hereinafter collectively as Tamashiro.) Linda Y. Dicken (Dicken) is a mathematics and computer science engineer in the aerospace industry. None of the petitioners have any background or experience in the recording industry. As will be described hereinafter, each of the petitioners made an investment to become one of the general partners in a partnership formed for the purpose of exploiting certain master tapes. None of the petitioners knew the identity of their co-general partners, had any partnership responsibility, participated in any way in partnership level decisions, or were generally aware of the partnership activities or financial arrangements. With the exception of Dicken, none of the petitioners had any awareness of the "sing-along" industry, its history, or potential. Dicken alone had used a sing-along machine prior to her investment. None of the petitioners, prior to their investment, made any inquiries or investigation from independent appraisers, accountants, or attorneys as to the value *570 of the tapes, the viability of the promotion, or the qualifications of its principals. Each petitioner(s) claimed a partnership share of the losses and ITC as a result of their investment, which respondent has disallowed. Cast of Players
Elliot P. Robbins (Robbins) possesses a business degree in accounting from St. Peter's College in New Jersey. Robbins was associated with Sarlo Realty as a real estate salesman and Sarlo Income Tax Service as a tax return preparer. He has 25 years experience as a tax return preparer. Robbins was president of Sarlo Investment Co. Robbins has no credentials in the music or recording business, except that he was a salesman for another master recording venture entitled "Stack-O-Hits." Michael Flicker (Flicker) is a 24 year veteran of the music industry. He first began his career at the age of 16, as a leader and songwriter of a band called The Zoo, which was given a contract by Bell Records (now Arista records). Flicker's band played as an opening act for such groups as The Doors and the Paul Butterfield Blues Band. At age 18, Flicker entered into the recorded music production field. Flicker founded Mushroom Records of America in 1976 *571 and has produced bands such as Heart, Al Stewart, and Poco. He has also produced such singles as "Seasons in the Sun," one of the top selling singles of all time, as well as the hit album "Dreamboat Annie" by the group Heart, which has sold over three and one-half million copies. Rommell Productions, Inc. (Rommell), dba Soft Image Products (SIP), was incorporated in the State of Washington in 1983, with Flicker as its only officer, director, and shareholder. Rommell produced and sold master recordings, as will be described and elaborated upon hereinafter. Dennis Morgan (Morgan) was involved in the marketing of motion pictures, as well as producing and promoting recording artists. Morgan was previously a manager of ex-Beatle George Harrison and a managing director of Elton John's record company Rocket Records. C. J. Sarlo (Sarlo) was the owner of Sarlo Income Tax Service. No other information was submitted on his background or qualifications. We presume he was also affiliated with Sarlo Realty and Sarlo Investment Co. American Evergreen Distributing Company (Evergreen) was formed in late 1983 by Norman Skolnik (Skolnik), who was also its owner and operator. Skolnik had been *572 in the consumer electronics industry for 30 years. Stephanie Yost (Yost) has held various positions, including back-up singer in recording sessions, concert promoter, and co-producer with Flicker on various recording projects. She married Flicker in 1985. The Karaoke Concept
The concept of Karaoke (Japanese for "sing-along") allows an individual to, in effect, record a song with his or her own private orchestra. This procedure requires a dual deck cassette tape recorder with microphones for dubbing and recording (the hardware). A cassette tape consisting of music only (the software) is played while an individual sings along, and both sets of sound are simultaneously recorded on a second blank cassette. Reverberation (echo chamber) may be added. The result is intended to sound as if the singer were performing in the studio during the original recording. Flicker first became interested in the Karaoke concept, while visiting Japan in 1976. On subsequent visits to Japan, Flicker noted its rapid, widespread growth. During the summer of 1983, Flicker received an invitation from Morgan to view a Karaoke machine Morgan was using as a promotional tool for the motion picture *573 "Get Crazy." Morgan suggested that Flicker examine the Karaoke machine and evaluate it. Flicker determined that the concept was exciting and might garner a limitless audience in the United States and Canada, as did the "Walk-Man," which was also a Japanese invention. In order to gain acceptance in the United States and Canadian markets, Flicker determined that modifications would have to be made to the Karaoke software. Flicker's analysis of then existing Japanese software revealed that the overall quality of the Japanese tapes was poor. In addition, the tapes were improperly formatted, containing multiple genres of music on one tape; for example, jazz, country, and rock and roll on one tape, rather than just one type. Also, the producers of the Japanese tapes failed in many cases to follow the popular arrangement of the song, sometimes leaving out entire sections of the original composition. Moreover, the software configuration used was 8-track, which by then had become passe' in the North American market of cassettes. Flicker determined he could overcome the existing weaknesses in Japanese software by producing a high quality master recording, true to the original composition, *574 formatted to a specific genre, and using cassette software. Accordingly, a team was assembled to exploit this future market. Flicker was to produce the master recordings. Robbins, who was previously introduced to the Karaoke concept by Morgan in May 1983, and to Flicker in October 1983, was responsible for raising money and structuring the partnership investment vehicles. Skolnik, who was an acquaintance of Morgan, was to distribute the tapes for the partnerships. Robbins formulated preliminary projections based in large part upon the success of the Karaoke machine in Japan. Robbins testified generally to consulting Japanese trade publications, which he believed reflected that the Karaoke market was in excess of one billion dollars per year, of which software accounted for 35 percent and hardware the remaining 65 percent. Robbins believed that tapes would follow the influx of Karaoke machines into the United States and Canada from Japan. Robbins determined that the potential United States market for software would be approximately $ 1,172,000,000, based upon $ 335,000,000 (apparently, his estimate of the then software market in Japan) times 3.5 (apparently, his comparison *575 of the relative populations of the United States and Japan). Robbins estimated that these ventures could capture 20 percent of this market. There is no evidence to show how he came to this "guesstimate." Production
Richard Feldman (Feldman) is a songwriter and producer and owns Orca Studios, which is located at his home. Feldman and Flicker had known each other since 1977; at one time, they were partners in a recording studio. During October or November 1983, Flicker approached Feldman regarding the use of Feldman's home studio. Flicker desired to use Feldman's studio on a full-time, around-the-clock basis in order to complete production of twenty master tape recordings before year end. Morgan selected the songs to be produced. In a letter from Flicker to Morgan dated October 10, 1983, Flicker indicated that the standard record budget for an album containing 8-10 songs runs between $ 125,000 and $ 200,000. The Songtrax tapes were designed to contain four songs. Accordingly, Flicker set a budget for each Songtrax tape at $ 75,000 in production costs, plus $ 5,000 for additional administrative costs. To produce all 20 Songtrax tapes, Rommell actually incurred the following *576 production costs, which were paid in cash: Cost
Cost Category
Services
$ 33,175
Equipment rentals/transportation
12,263
Publishing clearance fees
5,649
Studio rental
12,071
Talent (arrangements & contracts)
32,730
Total cash payments
$ 95,888
Flicker hired John Coury (Coury) and Peter White (White) as musicians to perform the music. Coury is an accomplished, classically trained, professional musician. He was primarily responsible for ensuring that the master tapes compared favorably with the original recordings, as to notes played, arrangements, instrumentation, and number of instruments played. He played piano, guitar, and synthesizers on the tapes, and programmed computers to play the percussion parts. Brad Gilderman and Rooster Productions (Rolf Hennemen) were hired to engineer the recording sessions. In addition to the cash payments, each of the above individuals or entities received a promissory note dated November 8, 1983, and signed by Flicker on behalf of SIP in the following amounts: Promisee
Amount of Note
Orca Studios
$ 492,000
Mike Flicker
410,000
John Coury
275,000
Peter White
135,000
Brad Gilderman
112,750
Rooster Productions
112,750
Total promissory notes
$ 1,537,500
*577 The notes generally promise that SIP will pay the stated principal with interest at 9% until paid. The notes then provide: "Payment will be made from the proceeds of the sale of Songtrax Tapes at the rate of 3% [5] [for Orca Studios] per tape until paid. [The meaning of this sentence is unclear.] This note becomes all due and payable November 1, 1997, regardless of source of payment." The notes do not identify the tapes from which payment is to be derived, but cover letters with the notes indicate that the face of the note is based upon a fixed rate per song title, and lists of song titles were attached to the letters. Thus, the cost of each 1983 tape was allegedly $ 4,794.40 cash ($ 95,888/20) plus $ 76,875, taking into consideration the face amount of the notes ($ 1,537,500/20). Other tapes were produced by Rommell during 1984 and 1985. However, no evidence as to their costs of production was submitted. Allegedly, similar promissory notes were *578 issued by SIP to only Flicker and Coury for the 1984 and 1985 tapes. Flicker testified that the costs of production were higher in 1983 due to the rush to finish the tape production in less than 60 days by the end of 1983. There is no evidence that any payments were made on any of these promissory notes, except perhaps an unknown amount to Coury on his 1983 note. Meanwhile, the Great American Sing Along Company, Inc. (GASA), was incorporated on December 8, 1983, with Morgan as its chief executive officer, director, and 50 percent shareholder, and Robbins as its treasurer, chief financial officer, director, and 50 percent shareholder. By separate Bills of Sale, dated as of December 15, 1983 (but notarized on December 27, 1983), SIP sold to GASA its United States interests in each single tape (referred to therein as a RAMM pack) for $ 5,000 cash and a "Secured Promissory Note" for $ 180,000. In addition, GASA was entitled to use SIP's Songtrax dba on a nonexclusive basis. The unassignable note, payable in 1997, provides for interest at 11% and "If the purchaser elects to duplicate and distribute software, the purchaser shall pay the seller one half of the net cash received from *579 the distributors after payment of any royalties." Both the Bill of Sale and the note were signed by Robbins on behalf of GASA. Formation of the Partnerships
Robbins was also busy forming, and obtaining investors for, general partnerships which would lease the master tapes. On December 31, 1983, Sorrento I (Sorrento) and Harbor I (Harbor) were formed. Coffey was one of the general partners of Sorrento. Tamashiro was one of the general partners of Harbor. The term of each partnership was seven years. Section 10.3 of the partnership agreement appoints Sarlo Investment Co. "as the exclusive Business Management of the Partnership." Section 11.2(ii) thereof provides: In the event of the removal of the Partnership business management by the holders of a majority of the then outstanding units, the Partnership shall continue to compensate the Partnership business management at the stipulated fee of ten-percent (10%) for the duration of the [seven year term] of all items of profit, and compensation together with the principal amount of any loans from the Partnership business management to the Partnership, and interest accrued therein, shall be paid to the Partnership business *580 management in cash.
By lease agreement dated December 30, 1983, GASA leased to each partnership a RAMM Pack for a period of 85 months in return for which each partnership agreed to pay $ 15,000, described as $ 12,000 first year rental plus $ 3,000 as 6-year prepaid minimum rent. In addition, each lessee was required to pay GASA 80 percent of the gross receipts, after deducting royalties. GASA agreed to pass through the ITC to the lessee. The lease was signed by Robbins on behalf of GASA and Sarlo on behalf of the partnerships. The lease directed delivery of the RAMM Pack to Evergreen. On December 30, 1983, the 1983 partnerships entered into distribution agreements with Evergreen. Robbins recommended that the partnerships utilize Evergreen as their distributor for Songtrax. Each partnership paid Evergreen $ 2,500 for initial distribution costs. The 1983 agreement provided for a seven year term with the right of the partnership to terminate Evergreen upon 30 days' written notice. Evergreen was given a nonexclusive distribution right to distribute Songtrax in the United States. The distribution agreements with Evergreen, for 1983, provided for a 20-percent payment to the *581 respective partnership and an 80-percent payment to GASA, after deducting appropriate royalty, copyright, and distribution fees from the wholesale price received from each tape. No fixed distribution fee for Evergreen is set forth in the distribution agreement. [6]
Evergreen failed to adequately perform as distributor for the partnerships. A rift developed between Robbins, who wanted to change distributors, and Morgan and Skolnik. Sometime before December 27, 1984, Flicker, Yost, and Robbins, doing business as Atlas, took over the distribution of Songtrax from Evergreen on behalf of the 1983 and, allegedly, the 1984 partnerships (notwithstanding that the 1984 partnerships were not created until that date). Shortly thereafter, Morgan was removed as an officer of GASA. On December 12, 1984, North American Sing Along Company, Inc. (NASA) *582 was incorporated in California. Robbins was its chief executive officer, secretary, chief financial officer, and sole shareholder. Atlas Music Distributors, Inc. (Atlas) was incorporated on April 15, 1985, with Yost as its president, chief executive officer, Robbins as its chief financial officer, and Flicker as its secretary. Robbins and Yost were each 50 percent shareholders of Atlas. For 1983, Sorrento and Harbor had no income. On the respective Forms 1065, Sorrento and Harbor reported losses of $ 15,775 and $ 15,676. Sorrento and Harbor had gross incomes of $ 92 and $ 217 and losses of $ 416 and $ 283 in 1984 and 1985, respectively. On December 27, 1984, additional partnerships were formed for the purpose of purchasing and distributing Songtrax tapes, including Tahiti I (Tahiti), of which Tamashiro was one of the general partners, and Venetia I (Venetia), of which Coffey and Houghton were two of the general partners. The 1984 partnership agreements were identical in form to those for 1983. By Bills of Sale dated November 8, 1984, SIP sold to NASA (although not yet incorporated) Songtrax tapes for $ 80,000 each, payable $ 5,000 in cash and $ 75,000 by promissory note due *583 in 14 years with interest at 9 percent. Each promissory note provides that said amounts are only payable "from and to the extent of the [purchaser's] royalties from the RAMM Pack * * * except that all unpaid interest and principal shall be due and payable on December 31, 1998 with recourse to the general assets of the [purchaser]". On December 24, 1984, the 1984 partnerships entered into purchase agreements with NASA to purchase RAMM Packs for $ 90,000 each. Venetia paid $ 22,000 cash and a note for $ 68,000, while Tahiti paid $ 19,360 cash [7] and a note for $ 70,640. The notes were payable in not more than 14 years with interest at 9 percent "plus twenty four percent gross profits before the indebtedness is fully paid and thirty-two percent thereafter." Principal and interest were payable "only from and to the extent of fifty percent of the * * * royalties from the SongTrax Ramm Pack" but ultimately payable in 1998 "with recourse to the general assets of the [partnership]". These documents were signed by Robbins for NASA and Sarlo for the partnerships. The purchase agreements provided the partnerships with the exclusive right to exploit the master tapes in the United States. *584 NASA was given a security interest in, and a general lien upon, the tapes, and proceeds derived from the sale, use, or exploitation thereof. For 1984 neither Venetia nor Tahiti had any gross income. They reported losses on their Forms 1065 of $ 22,688 and $ 22,448 respectively. During 1985, Venetia had gross income of $ 74 and a reported loss of $ 32,371. Tahiti had gross income of $ 65 and a reported loss of $ 32,260. In spite of the history of losses of the 1983 and 1984 partnerships, on December 30, 1985, additional partnerships were formed for the purpose of purchasing and distributing Songtrax *585 tapes, including Lido I (Lido), of which Dicken was one of the general partners. No documentation was submitted concerning the applicable terms of the partnership agreements, promissory note, security agreement, or purchase agreement for Lido. At trial, Robbins testified (and we so find) that the documentation pertaining to another 1985 partnership, Corsair I (Corsair), was substantially identical to that of Lido. The general partnership agreement, purchase agreement and promissory note for Corsair were substantially the same in form as those of the 1983 and 1984 partnerships. The promissory note provided for 11.69 percent per annum interest, due and payable December 12, 1999. The principal and interest was payable only from or to the extent of 50 percent of the royalties from the master recordings. Similarly, the promissory note was secured by the master recordings. For 1985, Lido had no income and a reported loss of $ 25,376. The 1983, 1984, and 1985 partnerships formalized their arrangement with Atlas by agreement dated December 30, 1985. This agreement provided for an initial one year term, with options for six additional years at Atlas' choosing. Atlas was given exclusive *586 distribution rights in the United States and Canada. The partnerships were given the right to terminate the agreement upon 30 days' written notice if Atlas ceased to distribute the Songtrax tapes. Royalties to the partnerships were to be based upon net sales (gross sales less returns, credits, and reserves against anticipated returns and credits). Initially, the agreement provided that, for each tape sold, the partnership was to receive 30 cents, while NASA and Rommell each would receive 25 cents. There were numerous exceptions to this, however. For example, Songtrax tapes sold through direct mail or mail order distribution only commanded one-half of the stated rate. The record reflects substantial evidence demonstrating extensive marketing efforts that occurred after 1985 by Atlas, Robbins, and others. We do not make any findings in respect thereof, as they are irrelevant to the issues presented. Master Tapes
Each Songtrax tape consisted of four songs, with each tape containing songs of the same genre. Accompanying each Songtrax tape was a lyric sheet with reprinted lyrics from the song, which also indicated the length of the introduction. Each song was recorded in *587 the same key as by the artist who made the song popular. Rommell obtained three copyrights in connection with each tape. The first was a performance copyright, owned by Rommell, for the actual recordings by Rommell of each of the selected songs. The second copyright related to the musical composition of the original song. This right is available either directly from the publisher or by statute (the mechanical reproduction license). The third copyright related to the lyrics, which must be obtained in order to reprint them (the reprint license). Evergreen and/or Atlas obtained the necessary mechanical reproduction and reprint licenses for the partnerships. Cover art for the songtrax cassettes was drawn by George Osaki, head of arts and graphics at MCA records, who has received music industry recognition for his cover art. The same drawing was used for each cassette produced. Promotional Materials
The promotional circular for the 1983 partnerships was prepared during the last quarter of 1983. The circular contained a description of the overall lease plan, numerous product descriptions of the Karaoke concept, and copies of literature detailing the growth of the Karaoke *588 phenomena in Japan, as well as a letter of support from Clarion, a manufacturer of Karaoke machines. The general thrust, however, of the circular was an in-depth legal analysis and illustration of how the ITC pass through operates to support a promised tax benefit of 2-1/4:1 The tax benefits are based, in part, on sales projections of 285,000 tapes over seven years, netting to the partnership $ .31 per tape. The offering circulars for the 1984 and 1985 partnerships generally contained the same descriptions and literature as in the 1983 circular. Substantively, however, the focus of the 1984 and 1985 circulars differed in that they described the mechanics of a tape purchase, with the attendant tax benefits regarding ITC and depreciation available to the partnerships as owners. Of note in the 1985 circular is a statement that the investors in the 1983 and 1984 partnerships elected to pool all revenues in order to spread the risk evenly among all investors. There is no indication in the record that any such "election" was ever made by partners of any of the partnerships nor that such election was beneficial to the partnerships represented in these cases. The 1984 circular contains *589 a projection of revenues and expenses based upon sales of 500,000 tapes over 13 years. Net revenues (without consideration of the tax benefits and capital costs) are projected at $ 134,398. The circular omits Sarlo Investment's 10-percent administrative fee, which would be $ 13,440. Capital costs are $ 127,000 (cash of $ 22,000 plus principal and interest payments on the note of $ 105,000). Thus, a close examination of the circular reveals an economic net loss after 14 years, if all projections come true. The projections in the 1985 circular are worse. The projected aggregated net cash flow to the partnership after 14 years (after considering the administrative fee and tax benefits) is $ 124,751, while aggregate payments on the promissory note alone (principal and interest) are projected at $ 141,100. There is no foundation in the record to support any of the projections contained in the circulars. The following schedule shows the disallowed losses and ITC claimed by petitioners on their tax returns. Petitioner
Year
Loss [8]
ITC
Coffey (Sorrento)
1980
$ 485
1983
$ 5,041
5,493
Jackson (Sorrento)
1980
1,043
1983
4,201
3,884
Houghton (Venetia)
1984
4,538
[9] 1,221
Tamashiro (Harbor)
1980
1,512
1983
3,493
2,611
1984
93
(Tahiti)
1984
6,803
1,364
(Harbor)
1985
63
(Tahiti)
1985
9,777
-
Dicken (Lido)
1985
5,126
799
*590 OPINION Petitioners bear the burden of proving that they are entitled to the claimed deductions and investment tax credits. ; Rule 142(a). In cases such as this, petitioners must show that they had a business purpose for engaging in the transaction other than tax avoidance, and that the transaction had economic substance beyond the creation of tax benefits. , affg. a Memorandum Opinion of this Court; , affg. a Memorandum Opinion of this Court. The test thus generally entails "both the taxpayers' subjective business motivation and the objective economic substance of the transactions." . *591 The Circuit to which this case may be appealed (the Ninth Circuit) has observed, "The consideration of business purpose and economic substance are simply more precise factors to consider in the application of this Court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of tax losses." ; . Business Purpose
The "business purpose" test involves the consideration whether a taxpayer had an "actual and honest profit objective" in engaging in the transactions at issue. , affd. ; ; see also , affg. a Memorandum Opinion of this Court. Section 162 allows a deduction for "ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business." To constitute a trade or business under section *592 162, an activity must in the first instance be engaged in with an objective of making a profit. ; , affg. a Memorandum Opinion of this Court; ; see . Similarly, the deduction under section 212 of expenses for the production of income is dependent upon a profit objective. , affg. in part, revg. and remanding . The same profit objective is necessary to obtain deductions for depreciation or to obtain the investment tax credit. Section 167(a) allows a deduction for depreciation only for property used in a "trade or business" or held "for the production of income." Section 48(a)(1), in turn, limits the investment credit to property with respect to which depreciation (or amortization) is allowable. , affd. without published *593 opinion sub nom. ; see The issue of whether the activities of the partnerships were engaged in with the objective of making a profit must be determined at the partnership level. ; . Although a partnership can contractually assign the duties and responsibilities of the income-generating operations to third parties, the profit objective must still be assessed from the perspective of the partnership. "Thus, where the partnership is virtually passive in its operations, the prudence it exercises in acquiring property and in assigning duties to third parties, and the care with which it oversees the performance of such duties are of heightened importance." . The Ninth Circuit has stated that an inflated purchase or lease price is "Perhaps the most important single factor suggesting that the actual motive for the * * * activities was tax avoidance rather than even speculative *594 profit." , affg. a Memorandum Opinion of this Court. Here, respondent's expert, Thomas Bonetti (Bonetti), provided the Court with a revealing picture of the value of Songtrax tapes. Bonetti has been in the recorded music industry for over 30 years and owned two corporations, Celebrity Licensing, Inc., and Janus Records, Inc., that dealt in the licensing, leasing, sale, and purchase of master recordings. Bonetti examined nine tapes, one from each partnership, plus four additional tapes, chosen at random. Bonetti assumed that each tape had clear title, all appropriate licenses had been obtained, but did not discount to present value, or amortize costs. In essence, Bonetti utilized a "best case scenario" to arrive at his valuation. Bonetti reasoned that, because of the relative ease of access into the generic tape market, and the subsequent competition which would be faced by the partnerships if the Karaoke machine became popular in the United States, the estimated actual cost approach would serve as a ceiling for valuation purposes, rather than a valuation based upon comparable *595 tapes, or a stream of income approach. Bonetti valued each tape at $ 2,000. Overall, we found the substance of Bonetti's testimony regarding the market potential for the Songtrax tapes and the value thereof credible and convincing. Generally, he found none of the tapes to have any celebrity cachet, or unique sound. Bonetti indicated that similar recordings have been produced, and that a substantial inventory of such recordings are in existence. Significantly, Bonetti observed that there was a scarcity of Karaoke hardware in the United States during the years at issue, which would have hampered the market for Karaoke software. Bonetti observed that the tapes were produced in the original key as performed by the original artist, which would present a problem for an individual who was unable to sing in that key. Although petitioners introduced evidence to show that a pitch control exists on current models of sing along machines, thus allowing an individual to change the key to his desired voice range, no evidence was submitted to show that such pitch control technology existed during 1983 through 1985. However, we note that Bonetti contradicted himself during the trial concerning *596 the level of overall musicianship on the tapes. In his report, he found the performance on each of the tapes he evaluated to be "somewhat below the standard of recording performance one would expect of recordings of this nature." He also found that the production of "these recordings were not comparable in either the production or engineering to professional quality recordings." However, at trial, Bonetti testified that the tapes were true to the original recording as to the notes played, instruments played, number of instruments, and musicianship, adding that Coury may have been overqualified. Although we believe that the overall engineering and performance on the tapes was generally good, such a belief does not change our evaluation as to the marketability of the Songtrax tapes and their valuation for purposes of this case. Petitioners' expert, Flicker, prepared an estimate of the cost production based upon his prior experience in the industry. Accordingly, he arrived at an estimate of $ 75,000 for a four song cassette tape. Although we find Flicker's credentials to be excellent, his bias and self-interest are obvious. Moreover, Flicker chose to ignore his actual 1983 cash *597 production costs of about $ 95,000 for 20 tapes (i.e. less than $ 5,000 per tape), which admittedly were larger than normal due to the urgency to finish by year end. At bottom, Flicker generally testified that the Songtrax tapes were the best of their kind on the market. This may be true; however, a well-produced tape with no viable market is only as valuable as the market dictates. [10]
Accordingly, we accept the expert testimony of Bonetti and thus find that the tapes in question had a fair market value of no more than $ 2,000. [11]. *598 At trial, Johnson, Coffey, Houghton, and Dicken testified. [12] We found the testimony of Jackson, Coffey, and Houghton to be substantially similar. Generally, each of the petitioners invested in the partnerships near year end. Each petitioner was introduced to the investment by Robbins. The partners testified that they had no prior experience with investing in master recordings, with the exception of Houghton, who had previously invested in a master recording entitled "Stack-O-Hits", which was also promoted by Robbins. None of the partners of each partnership knew or had previously met each other prior to the actual trial in this case. The partners held no formal meetings, but relied exclusively on Flicker and Robbins (and not Sarlo). Amazingly, each of the petitioners believed that Robbins was another general partner in the respective partnership. Petitioners exhibited a total *599 lack of knowledge as to any of the logistics, economics, or administration of the respective partnerships. None of the petitioners sought an independent evaluation of the market feasibility of the Songtrax tapes; the partners relied exclusively upon Robbins and Flicker, each of whom stood to profit handsomely from setting up the initial investment structure. In addition, petitioners failed to inquire into the terms of the leases or purchase agreements. None of the petitioners knew how much money was owed by the respective partnerships to GASA or NASA. Petitioners did not know who was the distributor of the tapes during the years at issue, or who is the current distributor. Most significantly, petitioners did not know whether they were personally liable on the partnership notes to GASA and NASA. Dicken differed from the other petitioners in that she had actually heard the Songtrax tapes and used them in her Karaoke machine before investing in Lido in 1985. She also allegedly consulted with her CPA beforehand. Dicken contended that she invested for purely economic reasons and that she was not in a position to take advantage of the tax benefits flowing from Lido. However, overall, *600 we do not find her testimony to be substantially different from the other petitioners. Like the others, she exhibited a complete lack of knowledge as to the activities of the partnerships, and how much money she may potentially owe NASA. Nor did she have an understanding as to how the distribution of the tapes was structured, or who the distributor was. Petitioners have failed to establish that they spent any time or effort either in actually managing the partnerships or in monitoring those individuals who were given exclusive management authority. The qualifications of Sarlo to act as the administrator and decision maker for the partnerships was not considered. No instruction or direction was given to him. Overall, the partners gave the general impression that they were essentially passive investors, much like a limited partner in a limited partnership, totally following the lead of Robbins, with a not-too-independent assist from Sarlo and Flicker. The economics of the investment also refutes any genuine business purpose. Even under the most optimistic assumptions (which had no foundation) it was most unlikely that any partnership could ever incur a profit. The logic, therefore, *601 of a partnership "agreeing" to share its revenues with other partnerships defies explanation. The structure of the notes of the partnerships also reflects no genuine intent to repay. All of the partnerships had a seven year term. However, the notes for the 1984 and 1985 partnerships to NASA were due and payable 14 years from their inception. The notes were payable from the assets of the promisee, which after dissolution would be zero. The structure indicates an attempt to disguise nonrecourse obligations as recourse. Accordingly, we find that the partnerships did not have an actual and honest profit objective. Economic Substance
The same factors that demonstrate petitioners' lack of a profit objective also convince us that, objectively, the Songtrax tapes lacked economic substance -- that is, the Songtrax tapes lacked any profit-making potential and existed only to generate tax benefits. We reviewed the factors that characterize an economic sham in There we stated: Key indicators of presence or lack of economic substance include presence or absence of arm's-length price negotiations, the relationship between the *602 sales price and fair market value, the structure of financing of the transaction, whether there was a shifting of the burdens and benefits of ownership, and the degree of adherence to contractual terms. [; citations omitted.]
As is apparent, and as we further stated in , applications of the "subjective" profit test share common characteristics with applications of the "objective" test of economic substance. See . Some of the "objective" factors set forth in Rose, however, provide extra weight to our determination that the transactions at issue lacked economic substance. For the sake of completeness, we address them briefly. The structure of the financing shows that the programs had no chance for a profit. Deferred debt that, in fact or in substance, is unlikely to be paid lacks economic substance. , affd. ; , affd. . *603 We examine the substance of such debt and are not guided solely by its form. Concerning the 1984 and 1985 partnerships, the existing long-term notes are not due and payable until December 15, 1998, and December 12, 1999, respectively. The amounts of the outstanding principal balances (ignoring accrued interest) are 30 to 35 times the value of the Songtrax tapes of $ 2,000. Although the notes were ostensibly "recourse", we believe that the structure of the Songtrax promotions was so commercially unreasonable as to the partnerships that it would take a great leap of faith on the part of the Court to believe that the notes were ever intended to be repaid or collected upon. See Rather, the promoters utilized the notes only to inflate the tax basis of the Songtrax tapes in order to increase the amount of the tax benefits. We also believe that the notes due and payable from GASA and NASA to Rommell, and from Rommell to individuals involved in the production of the Songtrax tapes, were contrived in order to give the appearance of commercial viability. [13]
*604 It is abundantly clear that the tax benefits generated by the partnerships more than paid for themselves on paper, without considering future profits, if any. The totality of the petitioners' respective actions suggests that they never considered any of the partnerships to be more than a vehicle to generate tax benefits. Each petitioner exhibited an amazing lack of knowledge concerning the terms and conditions of their respective investments in the partnerships, or how many tapes would have to be sold in order to break even. Yet, in the face of repeated losses and virtually nonexistent royalties, they continued to act passively in their role as general partners. The foregoing discussion convinces us that the Songtrax transactions lack both a profit objective and economic substance. This Court has time and time again characterized such transactions as mere shams. They have no effect for tax purposes, and petitioners are not entitled to claim losses and credits for the years in issue, including any carryback years that the Songtrax losses and credits may have affected. Section 6653(a)
Respondent determined that petitioners were subject to the additions to tax for negligence *605 under section 6653(a). Section 6653(a)(1) provides for an addition to tax equal to 5 percent of the underpayment if any part of any underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest due on that portion of underpayment attributable to such negligence or intentional disregard. Negligence is defined as the failure to exercise the due care of a reasonable and ordinarily prudent person under the circumstances. . Petitioners bear the burden of showing respondent's determinations to be erroneous. ; Rule 142. Petitioners contend that the additions to tax for negligence should not be imposed because they relied on Robbins (as their advisor), and the tax opinions contained in the offering circulars. Reliance upon a financial advisor must be reasonable under the circumstances. See , affd. without published opinion sub nom. , *606 affd. sub nom. , affd. without published opinion , affd. sub nom. . Prior to entering the partnerships, none of the petitioners sought the advice of an independent tax expert, or sought an independent expert appraisal of the Songtrax tapes. We note that the 1983 offering circular stated: "Prospective Lessees are advised that the foregoing, and the estimates of anticipated income tax consequences set forth in this presentation, are intended as descriptive summary only. Prior to entry into a Lease with Songtrax, the Lessee should, together with his or her tax or business advisor, examine the Songtrax RAMM Pack Equipment Lease Package." Again, the 1984 and 1985 offering circulars stated: "EACH PROSPECTIVE PURCHASER SHOULD CONSULT HIS OR HER OWN PROFESSIONAL ADVISORS AS TO LEGAL, TAX, ACCOUNTING AND OTHER MATTERS RELATING TO THE PURCHASE OF A RAMM PACK [Songtrax]." None of the petitioners had prior experience in the recording industry. Although petitioners were all general partners, they exhibited *607 a startling lack of knowledge regarding partnership operations, economics, and their own potential future liability for partnership debts. Moreover, petitioners' indifference to partnership affairs, in the face of substantial losses does not comport with reasonable business practices under the circumstances. Such blind reliance upon Robbins is insufficient. "At some point, naivete becomes a purposeful refusal to analyze the facts, perhaps due to the expectation that the tax benefits, alone, will justify the investment." . We also find petitioners' reliance upon , revg. a Memorandum Opinion of this Court, to be misplaced. The instant case is distinguishable from Heasley. In Heasley, the Fifth Circuit held that unsophisticated investors were not liable for negligence where they relied upon the expertise of their financial advisor and accountant and monitored their investment. However, as is clearly the case herein, a taxpayer may not be excused from the addition to tax for negligence based upon his reliance on a tax opinion and prospectus *608 which specifically disavows such reliance. See . Moreover, other than the self-serving testimony of Robbins, we are not convinced that petitioners monitored their investments in any meaningful fashion. Accordingly, we sustain respondent on this issue. Section 6659
Section 6659 provides, in pertinent part, for an addition to tax equal to 30 percent of an underpayment of tax attributable to an overvaluation of more than 250 percent in the value of property involved, or in the adjusted basis of such property. To incur the addition to tax, the underpayment must be at least $ 1,000. Petitioners Jackson, Houghton, and Tamashiro bear the burden of proving that the addition to tax under section 6659 should not be imposed. . Regarding petitioners Coffey and Dicken, however, since respondent raised the applicability of section 6659 in the amendments to his answers, respondent bears the burden of proof on this issue. Sec. 6214(a); ; Rule 142(a). In this case, the Songtrax tapes were worth no *609 more than $ 2,000 each. The partnerships calculated depreciation and claimed ITC using cost bases substantially more than 250 percent of $ 2,000. The deductions and/or credits, in each of the years at issue, generated underpayments in excess of $ 1,000. Moreover, each underpayment was "attributable" to a valuation overstatement; the overstated basis of the Songtrax tapes is central to our decision that the tax credits and depreciation deductions based thereon are invalid. Accordingly, the addition to tax under section 6659 is sustained as to all petitioners. Section 6621(c)
Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to "any substantial underpayment [exceeding $ 1,000] attributable to tax motivated transactions." A tax-motivated transaction specifically includes sham or fraudulent transactions. Sec. 6621(c)(3)(A)(v). The phrase "any sham or fraudulent transaction" includes transactions that are without economic substance. . In addition, valuation overstatements, as defined in section 6659, also fall within the definition of tax-motivated transactions *610 under section 6621(c)(3)(A)(i). See also sec. 301.6621-2T, Q & A-4(1), Temp. Proced. & Admin. Regs., (Dec. 28, 1984). We have determined that the transactions in issue were all shams, lacking economic substance, and, furthermore, that the Songtrax-related credits and deductions fall within the definition of valuation overstatements under section 6659(c). Accordingly, respondent is entitled to the increased interest on the entire portion of the deficiencies relating to petitioners' partnership investments in the Songtrax tapes. Decisions will be entered for the respondent. Footnotes
1. The following cases were consolidated for purposes of trial, briefing and opinion: Stephen J. Coffey, docket No. 12304-87; Ronald D. and Evelyn Woods Jackson, docket No. 20174-87; Raymon E. Houghton, docket No. 8786-88; Mike S. and Jacquelin Tamashiro, docket Nos. 8881-88 and 18341-89; and Linda Y. Dicken, docket No. 14111-89.↩
2. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The additions to tax set forth in the table under section 6659 for Coffey's 1983 year and Dicken's 1985 year were raised initially in respondent's respective answers. ↩
4. The appropriate statutory reference here for 1980 is section 6653(a). ↩
*. 50 percent of the interest due on the entire deficiency.↩
5. This percentage varied from 1% to 3% for the various promisees.↩
6. Some of the exhibits reflect bills from Evergreen to customers, which bills include a charge for shipping and handling. This may be the means by which Evergreen was to profit.↩
7. The purchase agreements provided for a cash payment in December and a short-term note due and payable on June 1 of the following year, respectively. Venetia's agreement provided for a $ 13,000 payment and a short-term note for $ 9,000; Tahiti's agreement provided for a $ 11,440 payment and a short-term note for $ 7,920. We presume that these short-term notes were timely paid and consider these amounts as cash terms.↩
8. Includes sec. 179 deduction, claimed and disallowed separately. ↩
9. It is not clear how much of this amount pertains to Songtrax, but Houghton has not claimed entitlement to ITC from any other acquisition.↩
10. Coury also testified as an expert regarding the production process and the fanatic attention to detail observed by the musicians and technicians. We have no reason to dispute Coury's opinion of the tape quality. However, from the perspective of a profit-making objective, as viewed by the partnership, we are not persuaded by Coury's estimate of worth.↩
11. Bonetti also opined that the useful life of each tape was no more than three years, contrary to the position taken by the 1983 partnerships. In view of our disposition herein, we need not discuss this aspect of his opinion.↩
12. The parties stipulated that, if called to testify, Tamashiro's testimony would be similar to that of Johnson, Coffey, and Houghton.↩
13. We note that Feldman testified that he received a copy of his note in 1986, and not when the Songtrax tapes were produced in December 1983. There was no negotiation concerning the note. Rather, Feldman was offered a piece of the action in the future, but no specifics were ever agreed upon. Feldman received no security to back his note, nor did he realistically expect to collect on it. Significantly, Feldman does not have possession of the note, nor does he know where it is.↩